1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   SORIN PALAGHIUC,

11             Petitioner,                No. CIV S-05-1115 RRB KJM P

12        vs.

13   MIKE EVANS,

14             Respondent.            <u>FINDINGS & RECOMMENDATIONS</u>

15   _____/

16             Petitioner is a state prisoner proceeding pro se with an application for a writ of

17   habeas corpus under 28 U.S.C. § 2254.  Petitioner challenges his 2003 conviction on charges of

18   first degree special circumstance murder, first and second degree burglary, first degree robbery,

19   attempted first degree burglary, and grand theft.  He claims that his Fifth and Sixth Amendment

20   rights were violated when the trial court admitted into evidence his involuntary and coerced

21   statements to police officers.  Upon careful consideration of the record and the applicable law,

22   the undersigned will recommend that petitioner's application for habeas corpus relief be denied.

23   /////

24   /////

25   /////

26   /////

1

I. <u>Background</u>

The California Court of Appeal's statement of the facts fairly represents the record:

Defendant was charged in Count one with first degree murder (§ 187) of Ricky McAuliffe on January 7, 2001, with personal use of a deadly and dangerous weapon – beer bottle and hammer – (§12022, subd. (b)(1)), with special circumstances that the murder was committed while engaged in the commission of robbery and burglary (§ 190.2, subd. (a) (17)). Counts two and three alleged the robbery (§211) and burglary (§459) of McAuliffe in his dwelling. Count four alleged a different burglary of a detached garage between June 1, 1999, and October 7, 1999. Count five alleged burglary of an inhabited dwelling on October 26, 2000. Count six alleged burglary of an inhabited dwelling on November 12, 2000. Count seven alleged burglary of an inhabited dwelling on November 28, 2000. Count eight alleged burglary of an inhabited dwelling on January 14, 2001. Count nine alleged theft of a shotgun (§ 487, subd. (d)) on January 14, 2001. Count ten alleged burglary of an inhabited dwelling on January 10, 2001. Count eleven alleged attempted burglary of an inhabited dwelling on January 18, 2001. Count twelve alleged burglary of a detached garage on January 18, 2001.

This appeal involves victim Ricky McAuliffe, who was found dead on January 7, 2001, of blunt force trauma in a living area within his place of business (a body shop). A broken beer bottle was found at the scene.

Homicide detectives learned defendant told his friends he committed the crime. The detectives arranged to wiretap a conversation between defendant and his friends George and John Whittington [FN] (which was played for the jury). During the wiretapped conversation on January 17, 2001, defendant said he went to the victim's place because the victim owed him money, and if the victim did not pay, defendant would "just bash his fucking head in." The victim "made the mistake" of insulting defendant and reaching for a knife or hammer. Defendant "had to teach him a lesson." Defendant hit and stabbed the victim with a 40-ounce beer bottle he had brought from home, which had been left at his home by George. Defendant then hit the victim with a hammer that was at the scene. Defendant said he "just exploded."

> [FN] For ease of reference, we hereafter refer to the brothers by first name.

Defendant described the blood and gore and said he felt like a huge weight had been lifted from his shoulders, and it was the "best high in the world."

> The jury was also presented with several audiotaped videotaped interviews . . . between defendant and homicide detectives, in which defendant admitted the killing and admitted he went to the victim's place not to collect a debt but with the intent to rob and kill him.
>
> Defendant did not testify at trial.  In closing argument to the jury, defense counsel did not dispute that defendant caused McAuliffe's death but argued the prosecution had not proved its case beyond a reasonable doubt, and the various confessions contradicted each other as to whether defendant went to McAuliffe's place to collect a debt or to rob or to kill.  Counsel suggested defendant had inflated his culpability in a desire to be punished for having caused the victim's death.
>
> On February 28, 2003, the jury returned verdicts finding defendant guilty as charged on all counts, and finding true the special circumstances and weapon use.
>
> The trial court sentenced defendant to 11 years, eight months in prison, plus a life sentence without the possibility of parole.

Opinion of California Court of Appeal filed Dec. 6, 2004, lodged in this action on Feb. 6, 2006 (hereinafter "Op.") at 3-5.

II.  Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Although "AEDPA does not require a federal habeas court to adopt any one methodology," Lockyer v. Andrade, 538 U.S 63, 71 (2003), there are certain principles which

3

1  guide its application.

2          First, the "contrary to" and "unreasonable application" clauses are different.  As

3  the Supreme Court has explained:

4          A federal habeas court may issue the writ under the "contrary to"
           clause if the state court applies a rule different from the governing
5          law set forth in our cases, or if it decides a case differently than we
           have done on a set of materially indistinguishable facts.  The court
6          may grant relief under the "unreasonable application" clause if the
           state court correctly identifies the governing legal principle from
7          our decisions but unreasonably applies it to the facts of the
           particular case.  The focus of the latter inquiry is on whether the
8          state court's application of clearly established federal law is
           objectively unreasonable, and we stressed in Williams [v. Taylor,
9          529 U.S. 362 (2000)] that an unreasonable application is different
           from an incorrect one.

10

11  Bell v. Cone, 535 U.S. 685, 694 (2002).  It is the habeas petitioner's burden to show the state

12  court's decision was either contrary to or an unreasonable application of federal law.  Woodford

13  v. Visciotti, 537 U.S. 19, 123 S. Ct. 357, 360 (2002).  It is appropriate to look to lower court

14  decisions to determine what law has been "clearly established" by the Supreme Court and the

15  reasonableness of a particular application of that law.  See Duhaime v. Ducharme, 200 F.3d 597,

16  598 (9th Cir. 1999).

17          Second, the court looks to the last reasoned state court decision as the basis for the

18  state court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  So long as the state

19  court adjudicated petitioner's claims on the merits, its decision is entitled to deference, no matter

20  how brief.  Lockyer, 538 U.S. at 76; Downs v. Hoyt, 232 F.3d 1031, 1035 (9th Cir. 2000).

21  However, when the state court does not issue a "reasoned opinion," this court must undertaken

22  an independent review of the claims.  Delgado v. Lewis, 223 F.3d 976, 982. (9th Cir. 2000).

23          Third, in determining whether a state court decision is entitled to deference, it is

24  not necessary for the state court to cite or even be aware of the controlling federal authorities "so

25  long as neither the reasoning nor the result of the state-court decision contradicts them."  Early v.

26  Packer, 537 U.S. 3, 8 (2002).  Moreover, a state court opinion need not contain "a formulary

4

1  statement" of federal law, so long as the fair import of its conclusion is consonant with federal

2  law.  Id.

3  III.  Admissibility of Petitioner's Statements to Police

4       A.  Background

5             In ground one of his petition, petitioner claims his statements to police were

6  improperly admitted into evidence at his trial, in violation of his Fifth and Sixth Amendment

7  rights.  The California Court of Appeal fairly described the background to these claims as

8  follows:

9           In a motion in limine, defendant sought exclusion of statements he
            made to law enforcement officers on January 18 and January 22,
10          2001, and "all fruit derived therefrom."

11          The trial court conducted a hearing, with testimony from the
            detectives who interviewed defendant and defendant's former
12          public defender, and transcripts of the following contacts between
            defendant and law enforcement, which defendant challenges in this
13          appeal:

14          1.  January 18, 2001

15          On January 18, 2001, defendant (age 20) was arrested for an
            unrelated burglary and invoked his right to remain silent.  While in
16          custody on the burglary charge, he was interviewed on videotape
            by detectives investigating the McAuliffe homicide.  They asked
17          some preliminary questions (e.g., birth date, address, phone
            number) and asked whether he was related to someone (his uncle)
18          who had the same address as defendant and had been interviewed
            concerning a homicide near the uncle's body shop near 30th and Q
19          Streets in Rio Linda.  The detectives told defendant they were
            investigating that case.  They read him his Miranda rights.  He said
20          he understood.  They asked if he was willing to talk.  He asked,
            "about what?"  They said, "about the case" and began asking
21          questions, which defendant answered.  Defendant initially denied
            knowing the victim.  When asked if he knew George Whittington,
22          defendant said George was a good friend who owned a thrift store
            and helped Women Escaping a Violent Environment.  When asked
23          if he thought George could be involved in the killing, defendant
            said, "Hell, no.  No way."[FN]  He said George was a "good guy"
24          who helped those less fortunate by giving them clothes and money.
            Defendant asked if George was a suspect.  The detective
25          responded, "Well, we're trying to figure this out.  Would there be
            any legitimate reason why his DNA or fingerprints would be there
26          at the scene?"  Defendant said, "I don't know."  The detective

5

asked, "if we arrested George for this murder, would it surprise you
at all?"  Defendant said, "Hell, yeah."  The detective asked, "if we
were going to arrest George for this, okay – we wouldn't want to
hurt him or anything – would you be willing to help us get him at a
safe location so we could arrest him without any difficulty?"
Defendant replied, "No way, man.  [¶] . . . [¶]  It's just . . . [¶] . . .
not the kind of guy I am.  No."

> [FN] A detective who testified at the hearing
> acknowledged they had no basis or plan to arrest
> George.

The interview continued as follows:

"[Defendant]:  Okay.  So you guys are going to arrest George on
this shit or what's going on?

"DET. STOMSVIK:  Well, we're trying to think of a reasonable
explanation why, like I said, his DNA or fingerprints would be at
the scene there, and you know –

"DET. BAYLES:  You have any idea at all?

"[Defendant]:  Damn.

"DET. BAYLES:  What?  Something tells me you got an idea.

"[Defendant]:  Um, yeah.

"DET. BAYLES:  Well, what's the idea?  We're all ears.

"[Defendant]:  Like the idea is I'm going to solve this case for you
right now.

"DET. BAYLES:  Okay.

"DET. STOMSVIK:  Okay.

"[Defendant]:  Okay?

"DET. BAYLES:  We're all cool.  Good.  We're all ears.

"[Defendant]:  And I'm going to save you guys a lot of pain and,
you know, woo-woo-woo.

"DET. BAYLES:  Okay.

"DET. STOMSVIK:  Go ahead.

"DET. BAYLES:  Solve it.

"[Defendant]:  Here's what happened.

"DET. BAYLES:  Okay.

"DET. STOMSVIK:  Okay.

"[Defendant]:  I'm going to tell – I'm going to solve this whole case for you right now.

"DET. BAYLES:  Okay.

"DET. STOMSVIK:  Okay.

"[Defendant]:  I did it."

Defendant said George had visited defendant's home the night before the killing and left a 40-ounce bottle of beer in the garbage. On the day of the killing, "the dude [the victim] looked at me wrong," so defendant went home, drank some beer, grabbed a bottle, went to the victim's shop, which was unlocked, found the victim on a bed with his eyes closed, smashed his head with the bottle, stabbed him in the head with the bottle, reached over and grabbed a hammer, and then killed him.  Defendant apologized for causing the detectives "a lot of time and trouble."

The detectives asked, "You're not just saying this to help George out, are you?"  Defendant replied, "No.  I'm the one who did it.  I swear to God.  I could tell you everything."  Defendant admitted knowing the victim; defendant had on occasion greeted him on the street, but the victim did not even acknowledge defendant.  Defendant said he went to "fuck his ass up" because "he stared at me wrong" and "I got drunk."  Defendant said, "It's like I'm a violent person, don't like no stares and shit, you know.  And just ever since I seen my dad kill himself and shit, you know, I got like problems up there, but I never went to get counseling."  The detectives commended defendant for taking responsibility and giving the victim's family closure.

Defendant said he took the hammer and the victim's wallet and burned them and threw the coins and metal part of the hammer in the creek.

Defendant denied any knowledge of the victim being a drug dealer. Defendant denied owing or being owed money with respect to the victim.  Defendant said he has used drugs in the past.  On the night of the killing, he did not use drugs but drank 80 ounces of beer, which was not unusual for him.

Defendant gave a detailed description of the killing and the crime scene.  He said he went to the victim's place not to kill him but "to fuck his ass up."  He did not care whether or not he killed the

7

victim.  He was mad enough to want the victim dead, and he made sure the victim was dead before he left the scene.

The transcript also shows:

"DET. STOMSVIK:  . . . You know this may send you to prison for a very long time, correct?

"[Defendant]:  Oh, yeah.  Oh, yeah.

"DET. STOMSVIK:  Oh, yeah.

"DET. BAYLES:  Uh-huh.

"DET. STOMSVIK:  Do you think it might help you, you won't hurt anybody else?  Are you afraid you might hurt someone else or –

"[Defendant]:  Um, I think I need some mental help or something, you know.  I mean, I was supposed to get it when I was like 10 and shit, you know –

"DET. STOMSVIK:  Uh-huh.

"[Defendant]:  – to see my dad kill himself and shit.  But you know, I'm not blaming it on that, you know.  It's just –

"DET. BAYLES:  Uh-huh.

"[Defendant]:  – something I can't control when I get mad, you know."

Defendant said he previously took Elavil but stopped and did not want to take it.

Defendant said he would take the blame to protect a friend, e.g., if George had committed the crime and defendant's DNA was on the bottle, defendant would "take the fall."

        2.  *February 15, 2001*

The detectives interviewed defendant on February 15, 2001, after a public defender began representing defendant.[FN]  Defendant said, "I don't like her [the lawyer].  I don't want her.  [¶] . . . [¶]  I just want to go – you know, I want to say I'm guilty."  The detectives first put on the record that they "got a call from a deputy over there [at the jail] sayin' you wanted to talk to us?"  Defendant said, "Yeah."  Defendant said he "pushed the button" in his room but no one answered, so he wrote a note, pushed the button again and "told him [a deputy in the jail] I wanted to talk to you guys.  He told me to stand by.  I pushed it again.  He told me to fly a kite.[FN]

I flew a kite, and then you guys were there."  The detective said: "So you contacted us.  We didn't contact you, right?"  Defendant said, "Yeah."

> [FN] Amy Rogers of the Public Defender's Office was apparently appointed to represent defendant when the complaint was filed on January 22, 2001.  She made her first appearance in the case on February 5, 2001.  (She was subsequently relieved and a different public defender represented defendant at trial.)

> [FN] A detective testified at the hearing that a kite is a form for inmates to write messages.

Defendant said he had "found God."  He asked to speak with the detectives because he wanted to correct some statements he made in the first interview.

The detectives again read defendant his rights and asked, "You understand, and do you want to talk?"  Defendant said, "All right."  Defendant said he wanted to plead guilty "[c]uz I killed him.  I robbed him.  I went over there knowingly and willfully."  Defendant did not attack the victim because of any look the victim gave him.  Defendant had heard the victim received a new supply of heroin and went to rob him.  Defendant also described some bad feelings arising from a prior sale of baseball cards.  Defendant said he made his living by "robb[ing]" houses.  Defendant indicated other persons were involved in planning the robbery of the victim, but defendant refused to name them.  Defendant said he decided before he went there that he was going to kill the victim.  Defendant described other burglaries he committed.

With respect to McAuliffe, defendant said, "I killed him in cold blood to rob him, and I want to plead guilty, and this lawyer of mine she doesn't care to hear it."  Defendant said he thought the lawyer's motive was "[t]he dollar figures," and "she's seeing that, you know, I seen my dad kill himself, and you know, I guess use the, oh, you're messed up in the head routine for . . . [¶] . . . [¶] . . . a long time so she could get paid."

The transcript shows towards the end of the conversation the detective commented they would have to try to figure out the identities of the accomplices and stated:

"DET. STOMSVIK:  If you feel in your heart that – um – you'd like to do that, you know – um– give us a call, contact us.  Um – we're kind of on some touchy legal grounds here.  Okay?  We're not really supposed to be contacting you.

"[Defendant]:  I contacted you.

9

"DET. BAYLES:  You did.

"DET. STOMSVIK:  You can call us anytime you want, and we'll talk to you.

"[Defendant]:  Let me get your guys's [sic] number."

"DET. STOMSVIK:  Okay.  I'll give you a card.

"[Defendant]:  We gonna get in touch tomorrow about that [sic] burglaries?

"[¶] . . . [¶]

"DET. BAYLES:  . . . as we are right now you want us to come and contact you again tomorrow?

"[Defendant]:  Yeah."

The detectives and defendant arranged a tour for the following day for defendant to show locations of his burglaries.  The detectives told defendant that if something came up and they could not make it, "call us.  Okay?  It's easier for you to call us than it is for us to – to go over there.  See, we can't really just call and talk to you, but you can call and talk to us."

     3.  *February 19, 2001*

On February 19, 2001, the detectives met with defendant, who disclosed the names of his accomplices.  The transcript confirms defendant "invited you guys – I told you guys to come and get me so I could talk to you guys about some of your cases.  . . . Give you some information – . . . – to help you guys.[FN]  The detectives again read defendant his *Miranda* rights and stated on the record that the interview was being videotaped.  Defendant said that, after talking to his girlfriend and reading the Bible, he decided to disclose the names of his accomplices.

     [FN] Ellipses replace the detective's interjections of "right" and "Uh-huh."

After a long interview, the detectives left the room.  Defendant prayed aloud.

The detectives retrieved defendant, and they went on a drive for defendant to show them houses he had burglarized.

     4.  *March 15, 2001*

The final interview challenged by defendant on appeal occurred on March 15, 2001, after defense counsel expressed a doubt about

defendant's competency to stand trial (which was ultimately unsuccessful).[FN]

> [FN] On February 23, 2001, defense counsel expressed a doubt as to defendant's competency to stand trial, pursuant to [California Penal Code] section 1368.  The trial court declined to prohibit contact between defendant and law enforcement but did order that the detectives not initiate contact.  The trial court appointed Doctors Nakagawa and Wilkonfield to examine defendant and ordered police not to initiate contact with defendant regarding this case.  On February 27, 2001, defense counsel told Detective Stomsvik by telephone that defendant had a history of mental problems and had been "1368'd."  She asked if the detective would call her the next time he received a call from defendant.  The detective said he would talk to the District Attorney's office about it (which ultimately told him he did not have to comply with defense counsel's wishes).  Defense counsel advised defendant not to speak with law enforcement.  Defendant nevertheless initiated another contact with detectives on March 2, 2001; he told them his friends were mad at him for disclosing the names of his accomplices, but he had to do the right thing and do "what the Lord wants."  On March 16, 2001, the doctors filed their reports, and the trial court found defendant competent to stand trial.

A transcript of an interview on March 15, 2001, shows:

"DET. BAYLES:  Um, you called my office and told me that you needed to speak with us.

"[Defendant]:  Yes.

"DET. BAYLES:  [Stated location of interview] and we're only here because you requested that we come talk with you.

"[Defendant]:  Yes, that's right.

The detective again advised defendant of his *Miranda* rights, and defendant confirmed he understood his rights and wanted to talk to the detectives without his attorney present.  Defendant spoke about the car used to drive to McAuliffe's place.  Defendant also said he found peace by confessing to the killing.  Defendant again admitted killing McAuliffe and said he was going to plead guilty.  His lawyer was trying to show he was crazy, to get him "off the hook," but he wanted to take responsibility.

1          5. *The Ruling*

2          On January 29, 2003, the trial court denied the motion in
           limine/suppression motion.  The court observed defendant on
3          videotape appeared relaxed and comfortable.  The court found no
           deceit or coercion that would render the confession involuntary.
4          The trial court later reconsidered the matter and reaffirmed its
           ruling.

5

6   Op. at 6-15.

7          In addition to the interrogations described above, petitioner challenges statements

8   he made to police on January 22, 2001, prior to the time he was arraigned and obtained counsel.

9   The record reflects that petitioner was interviewed by Detective Stomsvik on that date.  Clerk's

10  Transcript on Appeal (CT) at 1094-1109.  Detective Stomsvik began the interview by stating that

11  he had talked to George.  Id. at 1095.  He asked petitioner if he had also spoken with George.  Id.

12  Stomsvik told petitioner he "did the right thing" in confessing to the crime.  Id. at 1096-1097.

13  After Stomsvik made this remark, he gave petitioner Miranda[1] warnings, obtained petitioner's

14  waiver of his rights, and continued the questioning.  Id. at 1097.  During the interview, petitioner

15  filled in several details about the crime, described his use of drugs and expressed remorse.  Id. at

16  1098-1108.

17         B.  Petitioner's Statements on January 18 and 22, 2001

18         Petitioner claims that his statements during the police interview on January 18,

19  2001, before he obtained counsel, were involuntary and coerced because they were caused by the

20  officers' false threat to arrest and charge his innocent friend George for the murder and their

21  encouragement to "do the right thing."  Pet. at 2; Points and Authorities in support of Petition (P.

22  & A.) at 11-12.  He states, "[t]he police used psychological coercion to get defendant to commit

23  to the murder by threatening to arrest his boyhood friend, George W., and using his mental

24  illness and religious beliefs."  P. & A. at 15.  Petitioner argues that his subsequent statements on

25  _____

26      [1]  Miranda v. Arizona, 384 U.S. 436 (1966).

January 22, 2001, also made before he obtained counsel, were similarly inadmissible because

they were tainted by the interrogation on January 18.  Id. at 12.

       1.  State Court Opinion

         The California Court of Appeal rejected petitioner's challenges to his statements

on January 18 and 22, 2001.  With respect to petitioner's claim that his confession was coerced

by threats to arrest George for the murder, the state appellate court noted that "[c]ases that have

held confessions involuntary, on the ground they were induced by threats to persons other than

defendant, have all involved threats to close family members of the defendant."  Op. at 2; see

also id. at 18-21.  The court concluded that these cases were inapposite because George was not a

member of petitioner's family.  The court explained:

> Here, there was no threat to arrest a relative.  Defendant merely
> asserts George is a very good childhood friend.  He told the
> detectives he and George were neighbors from the time defendant
> was 10 until he turned 17.  Defendant said he remained "good
> friends" with George.
>
> At oral argument, defendant's counsel acknowledged she had been
> unable to find a case holding a confession was rendered
> involuntary by threats to arrest a defendant's friend.  However,
> counsel argued the relationship between defendant and his friend
> George was "like family."  However, the record does not support
> the argument.
>
> The record shows that, at most, defendant characterized his
> relationship with George as "good friends."  George's brother,
> John, characterized the relationship between defendant and George
> as "fairly close friends."  George lived across the street from
> defendant from the time defendant was 10 years old until defendant
> was 17 years old.  However, contrary to counsel's claim at oral
> argument, there is no evidence that defendant and George ever
> lived in the same household.  These circumstances fall short of
> demonstrating that defendant's friendship with George was the
> equivalent of a close family relationship.
>
> The essential vice that the coerced-confession rule is designed to
> avoid in this context is that a defendant will falsely take the rap to
> save a loved one from arrest and incarceration.  In other words,
> there is a danger that an innocent person will be convicted.  On this
> record, we are confident that, given defendant's relationship with
> George, he would not have falsely confessed to murder to save
> George from being arrested.

1                 We therefore reject defendant's argument that the insinuations of
the police, that George would be arrested for the crime, rendered
2                 defendant's confession involuntary.

3  Id. at 20-21.

4                 The California Court of Appeal also concluded that the totality of the

5  circumstances indicated petitioner's statements was voluntary.  Id. at 21.  The court explained its

6  reasoning as follows:

7                 The totality of circumstances in this case weighs heavily in favor of
voluntariness.  Unlike Neal, supra, 31 Cal.4th 63, here there was
8                 no continued interrogation after invocation of rights.  There was no
deprivation of food, water, or toilet facilities.  Defendant
9                 acknowledges the interview lasted only two hours.  The
interrogation was not heavy-handed but rather cordial.  There is no
10                indication that defendant was of insufficient intelligence to
understand the rights he was waiving or the consequences of the
11                waiver.  The trial court noted defendant appeared relaxed and
comfortable on the videotape.  Although defendant was only 20
12                years old, he knew his rights and had demonstrated his ability to
look out for himself by invoking his right to remain silent on the
13                two prior occasions.  That his friendship with George moved him
to confess in order to protect George from a perceived threat of
14                arrest does not render his confession a product of unlawful
coercion.  Moreover, defendant's own statements reflect another
15                reason for his confession was that he hoped to get mental help for
anger control.  The circumstances that defendant had anger control
16                problems and saw his father kill himself do not rise to the level of
mental defect that would undermine the voluntariness of his
17                confession.  Additionally, defendant's subsequent interviews reveal
a conscience.  A factor weighing in favor of voluntariness is the
18                apparent pressure that the defendant's guilty conscience exerts
upon him.  [Citation omitted.]
19

20                We conclude the totality of circumstances weighs in favor of
voluntariness.

21                In light of our conclusion that the January 18 statement was
voluntary, we need not address defendant's arguments that
22                subsequent interviews were the product of an initial unlawful
coercion on January 18.
23

24                We reject defendant's suggestion that his second confession was
coerced because the detective began the interview by mentioning
George and saying defendant was doing the right thing.
25

26                We also reject defendant's suggestion that subsequent interviews
were conducted despite the detectives' awareness that defendant

had possible psychiatric or mental problems (because he spent a night in the jail's psychiatric ward and because his lawyer expressed doubt as to his mental competence).  He asserts the jail records indicate he ultimately was diagnosed as suffering from bipolar disorder, major depression and possible psychosis.  However, he merely cites a 10-page span of handwritten (some illegible) notes from the jail psychiatric services.  We note an entry on March 15, 2001 (the date of the last interview at issue in this appeal), states, "Unlikely that he suffers from mental illness."  A later note, dated June 29, 2001, merely says, "possible" bipolar disorder and psychosis.  The trial court stated defendant did not appear to have any mental defect in the videotaped interviews, and the court noted it had found defendant competent to stand trial.  Even assuming for the sake of argument the truth of defendant's assertions that illegible handwritten jailhouse notes say he had on-going mental problems and engaged in self-destructive behavior such as banging his head against his cell wall, defendant presented no evidence that any psychiatric or mental problem vitiated his ability to make a voluntary waiver of his <u>Miranda</u> rights.

We conclude defendant's custodial statements were voluntary, and their admission did not violate defendant's <u>Miranda</u> rights.

<u>Id.</u> at 21-23.

### 2.  Applicable Law

The Constitution demands that confessions be made voluntarily.  <u>See</u> <u>Lego v. Twomey</u>, 404 U.S. 477, 483-85 (1972).  Involuntary confessions may not be used to convict criminal defendants because they are inherently untrustworthy and because society shares "the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves."  <u>Spano v. New York</u>, 360 U.S. 315, 320-21 (1959).  A confession is voluntary only if it is "'the product of a rational intellect and a free will.'"  <u>Medeiros v. Shimoda</u>, 889 F.2d 819, 823 (9th Cir. 1989) (quoting <u>Townsend v. Sain</u>, 372 U.S. 293, 307 (1963)).  <u>See also</u> <u>Blackburn v. Alabama</u>, 361 U.S. 199, 208 (1960).  "The line of distinction is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession."  <u>Collazo v. Estelle</u>, 940 F.2d 411, 416 (9th Cir. 1991) (en banc) (quoting <u>Culombe v. Connecticut</u>, 367 U.S. 568, 602 (1961)).  In

1   the end the court must determine under the totality of the circumstances whether "the government

2   obtained the statement by physical or psychological coercion or by improper inducement so that

3   the suspect's will was overborne." Beatty v. Stewart, 303 F.3d 975, 992 (9th Cir. 2002) (quoting

4   United States v. Leon Guerrero, 847 F.2d 1363, 1366 (9th Cir. 1988)). See also Hutto v. Ross,

5   429 U.S. 28, 30 (1976); Haynes v. Washington, 373 U.S. 503, 513-14 (1963).

6           "There is no 'talismanic definition of 'voluntariness'' that is 'mechanically

7   applicable.'" Clark v. Murphy, 331 F.3d 1062, 1072 (9th Cir. 2003) (quoting Schneckloth v.

8   Bustamonte, 412 U.S. 218, 224 (1973)).  Rather, voluntariness is to be determined in light of the

9   totality of the circumstances.  See Miller v. Fenton, 474 U.S. 104, 112 (1985); Haynes, 373 U.S.

10  at 513; Beatty, 303 F.3d at 992; Derrick v. Peterson, 924 F.2d 813, 817 (9th Cir. 1990).  This

11  includes consideration of both the characteristics of the petitioner and the details of the

12  interrogation.  Schneckloth, 412 U.S. at 226 (The court must examine "the factual circumstances

13  surrounding the confession, assess [ ] the psychological impact on the accused, and evaluate [ ]

14  the legal significance of how the accused reacted."); see also Withrow v. Williams, 507 U.S. 680,

15  693 (1993); Clark, 331 F.3d at 1072; Henry v. Kernan, 197 F.3d 1021, 1026 (1999)

16  ("Voluntariness depends on such factors as the surrounding circumstances and the combined

17  effect of the entire course of the officers' conduct upon the defendant.").  Relevant circumstances

18  that should be considered include the following factors: (1) the youth of the accused; (2) his

19  intelligence; (3) the lack of any advice to the accused of his constitutional rights; (4) the length of

20  the detention; the prolonged nature of the questioning; and (5) the use of any punishment such as

21  the deprivation of food or sleep.  Schneckloth, 412 U.S. at 226; United States v. Haswood, 350

22  F.3d 1024, 1027 (9th Cir. 2003).

23          Officials cannot extract a  confession "by any sort of threats or violence, nor . . .

24  by any direct or implied promises, however slight, nor by the exertion of any improper

25  influence." Hutto, 429 U.S. at 30 (quoting Bram v. United States, 168 U.S. 532, 542-43 (1897)).

26  Neither physical intimidation nor psychological pressure is permissible.  Haswood, 350 F.3d at

1027 ("A confession is involuntary if coerced either by physical intimidation or psychological

pressure."); United States v. Tingle, 658 F.2d 1332, 1335 (9th Cir. 1981) ("subtle psychological

coercion suffices . . . at times more effectively 'to overbear a rational intellect and a free will'").

      False promises or threats may also render a confession invalid.  See, e.g., Lynumn

v. Illinois, 372 U.S. 528, 534 (1963) (confession found to be coerced by officers' false statements

that state financial aid for defendant's infant children would be cut off, and her children taken

from her, if she did not cooperate); Rogers v. Richmond, 365 U.S. 534, 541-45 (1961)

(defendant's confession was coerced when it was obtained in response to a police threat to take

defendant's wife into custody); Spano, 360 U.S. at 323 (confession found to be coerced where

police instructed a friend of the accused to falsely state that petitioner's telephone call had gotten

him into trouble, that his job was in jeopardy and that loss of his job would be disastrous to his

three children, his wife and his unborn child); Miranda, 384 U.S. at 476 ("any evidence that the

accused was threatened, tricked, or cajoled into a waiver (of Fifth Amendment right to remain

silent) will, of course, show that the defendant did not voluntarily waive his privilege").  But cf.

Pollard v. Galaza, 290 F.3d 1030, 1034 (9th Cir. 2002) ("misrepresentations made by law

enforcement in obtaining a statement, while reprehensible, does not necessarily constitute

coercive conduct").

      3. Discussion

      The California Court of Appeal concluded that the totality of the circumstances

indicated petitioner's confessions on January 18 and 22, 2001, which were obtained prior to the

appointment of counsel, were voluntary and that the detectives' methods of interrogation,

including their remarks about George and their appeals to petitioner's conscience, did not cause

petitioner's will to be overborne.  This court agrees.  A review of the relevant record reflects that

the questioning in this case was not so heavy-handed that it would have caused petitioner to lose

"self-direction."  On the contrary, as noted by the state appellate court, the atmosphere was

friendly and non-threatening.  Petitioner understood that he had a right to remain silent, having

1  invoked it during the questioning that occurred prior to the interrogation that resulted in his

2  confession on January 18, 2001.  Op. at 6.  It is apparent from the transcript of the interrogations

3  that petitioner had a strong desire to confess his actions to the police and that he did so without

4  much prompting.  In fact, petitioner told Detective Bayles that it gave him "peace" to confess.

5  See CT 494; see also CT 522.  Petitioner has not cited any authority for the proposition that a

6  criminal defendant's statements are rendered involuntary merely because he acts according to his

7  conscience, his religious beliefs, or his desire to protect a friend.  As noted by the state appellate

8  court, all cases in which coercion has been found have involved threats by the police to the

9  suspect's family members.  That was not the case here.  Finally, although petitioner states he had

10  "a history of mental problems," there is no evidence that any of these problems caused petitioner

11  to confess against his will.  The decision of the California Court of Appeal denying petitioner's

12  claims in this regard is not contrary to or an unreasonable application of federal authority, nor is

13  it based on an unreasonable determination of the facts.  Accordingly, petitioner is not entitled to

14  habeas relief.

15          C.  Petitioner's Statements between February 15, 2001 and March 30, 2001

16          In ground two, petitioner claims his statements to police between February 15 and

17  March 30, 2001 should have been excluded by the trial court because they were obtained in

18  violation of his Sixth Amendment right to counsel.  Pet. at 2.  Specifically, petitioner argues the

19  detectives knew he had "a history of mental problems," which rendered him incapable of making

20  a voluntary waiver of his right to counsel, but that they nevertheless continued to question him

21  and play on his conscience in order to obtain a confession.  P. & A. at 12-14.  He states, "[t]he

22  police also showed total disrespect for his right to counsel by continuing to have contact with

23  defendant (even though he was undergoing psychiatric evaluation for competency to stand trial)

24  and substituting themselves as his legal advisor."  Id. at 15.

25  /////

26  /////

1        1. <u>State Court Opinion</u>

2        The California Court of Appeal denied petitioner's Sixth Amendment claims,

3 reasoning as follows:

> Here, defendant was arraigned and a deputy public defender was
> appointed for him on January 22, 2001.  Thereafter, it was
> defendant who initiated all contacts with the detectives.  On each
> occasion (as reflected in our recitation of each specific interview),
> defendant initiated the contact, the detectives repeated the *Miranda*
> advisements, and defendant chose to speak.
>
> Defendant reiterates his argument that the detectives violated his
> rights because they were aware that he had ongoing mental
> problems that would undermine his exercise of free will to waive
> his right to have counsel present during interviews in which he
> incriminated himself.  As we have explained, this argument is
> without merit.
>
> Defendant claims, with no citation to any evidence in the record,
> that he waived counsel under his continuing belief that he needed
> to help the detectives solve the case in order to protect George.  He
> says he spoke to the officers without counsel because of his
> conversion to God (which he suggests the detectives exploited by
> praising him for doing "the right thing").  The latter circumstance
> is not grounds for reversal, and the former point is undercut by
> defendant's own statements reflecting he found confession good
> for his soul.  Defendant's view that the detectives took advantage
> of his religious conversion is not supported by the record.
>
> Defendant argues this case is similar to <u>Michigan v. Harvey</u> (1990)
> 494 U.S. 344 [108 L.Ed.2d 293], where the officer told the
> defendant he did not need to speak to an attorney because the
> attorney would receive a copy of his statement.  Here, however, it
> was defendant who made it clear that he had conferred with
> counsel, knew her position, and had no use for her because she
> would not honor his wishes.
>
> We conclude the admission of defendant's custodial statements did
> not violate his right to counsel.

Op. at 24-25.

        2. <u>Applicable Law</u>

        "The prosecution may not use statements, whether exculpatory or inculpatory,

stemming from custodial interrogation of the defendant unless it demonstrates the use of

procedural safeguards effective to secure the privilege against self-incrimination." <u>Miranda</u>, 384

19

U.S. at 444.  To this end, custodial interrogation must be preceded by advice to the potential

defendant that he has the right to consult with a lawyer, the right to remain silent and that

anything stated can be used in evidence against him.  Id. at 473-74.  If the accused invokes his

right to counsel, courts may admit his responses to further questioning only on finding that he (a)

initiated further discussions with the police, and then (b) knowingly and intelligently waived the

right he had invoked.  Edwards v. Arizona, 451 U.S. 477, 485-86 (1981).  See also Wyrick v.

Fields, 459 U.S. 42, 44 (1982) (per curiam ) (before a suspect in custody can be subjected to

further interrogation after requesting an attorney there must be a showing that the "suspect

himself initiates dialogue with the authorities").  A conversation is initiated for purposes of

Edwards when an accused "evince[s] a willingness and a desire for a generalized discussion

about the investigation," as opposed to "a necessary inquiry arising out of the incidents of the

custodial relationship."  Oregon v. Bradshaw, 462 U.S. 1039, 1045-46 (1983) (plurality opinion).

"As a general matter . . . an accused who is admonished with the warnings

prescribed by this Court in Miranda . . . has been sufficiently apprised of the nature of his Sixth

Amendment rights, and of the consequences of abandoning those rights, so that his waiver on

this basis will be considered a knowing and intelligent one."  Patterson v. Illinois, 487 U.S. 285,

296-297 (1988).  Therefore, "[o]nce it is determined that a suspect's decision not to rely on his

rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and

that he was aware of the State's intention to use his statements to secure a conviction, the analysis

is complete and the waiver is valid as a matter of law."  Moran v. Burbine, 475 U.S. 412, 422-23

(1986).

3.  Analysis

At the time of the police interrogations between February 15 and March 30, 2001,

petitioner was represented by counsel.  Op. at 24.  However, the record reflects that petitioner

repeatedly initiated conversations regarding his case by requesting that the detectives come to his

cell so he could add more details to his previous confession.  Indeed, petitioner initiated these

1   discussions precisely in order to confess.  When the subject of petitioner's counsel came up,

2   petitioner made it clear he did not trust her and did not want her to be present at the interviews.

3   Under these circumstances, the trial court's factual finding that petitioner initiated contact with

4   the police prior to all of these conversations is not based on an unreasonable determination of the

5   facts of this case.

6          As the Edwards rule against police-initiated communications does not apply, this

7   court must determine whether petitioner validly waived his Sixth Amendment rights.  That

8   determination depends "upon the particular facts and circumstances surrounding the case,

9   including the background, experience, and conduct of the accused."  Bradshaw, 462 U.S. at 1046

10  (citation omitted).

11         This court agrees with the California Court of Appeal that the facts and

12  circumstances of this case demonstrate petitioner's waiver of his right to counsel was voluntary.

13  Petitioner was given Miranda warnings prior to each of the conversations between February 15,

14  2001 and March 30, 2001.  Each time, petitioner articulated a rational reason why he did not

15  want counsel present during the interview: contrary to petitioner's wishes, counsel wanted to

16  explore legal defenses to the charges against him.  Although petitioner states he had "a history of

17  mental problems," there is no evidence that any of these problems prevented petitioner from

18  understanding his rights or voluntarily waiving his right to counsel.  The totality of the

19  circumstances indicates petitioner's statements to the police detectives in the absence of his

20  counsel were the product of petitioner's uncoerced choice based upon an understanding of his

21  rights.

22         Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for

23  a writ of habeas corpus be denied.

24         These findings and recommendations are submitted to the United States District

25  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

26  days after being served with these findings and recommendations, any party may file written

objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED:  April 15, 2008.

_____
U.S. MAGISTRATE JUDGE

8:pala1115.hc

22